FILED - USDC - FLMD - ORL
NOV 16 2026 PM3:48

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| HENRY L. McCONE | ) Case No.: 6:26-cv-2680-PGB-NWH |
| Plaintiff, | ) |
| vs. | ) |
| | ) COMPLAINT FOR |
| BOARD OF COUNTY COMMISSIONERS | ) DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, and COMPENSATORY DAMAGES |
| Defendants | ) |
| | ) DEMAND FOR JURY TRIAL |

## INTRODUCTION

1. This is an action for retaliation and discrimination pursuant to 42 U.S.C. § 2000e *et seq.* (Title VII of the Civil Rights Act of 1964), as amended by the Civil Rights Act of 1991,

## JURISDICTION AND VENUE

2. Jurisdiction is conferred on this Court by Sections 703(a), 704(a), 706(f)(1), 706(f)(3), 42 U.S.C § 12203, 12117 Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq., for retaliation. Jurisdiction is specifically conferred on this Court by 42 U.S.C. §2000e-5(f); 42 U.S.C. § 2000e-3(a). Equitable and other relief is sought under 42 U.S.C. § 2000e-5(g) and the Civil Rights Act of 1991, 42 U.S.C. § 1981a. Furthermore,

the jurisdiction of this Court is invoked, and venue is proper in this district, pursuant to 28 U.S.C. §§1331 and 1391 as Plaintiff claims are substantively based on Title VII.

3. Defendant is an "employer" engaged in an industry affecting commerce as defined by 42 U.S.C. § 2000e(b) and employs 50 or more employees.

**Venue**

4. Defendant operates within the Middle District of The State of Florida. All actions by Defendant alleged herein occurred within the Middle District of The State of Florida. Venue in this district is proper for the Defendant pursuant to 28 U.S.C. § 1391(b) & (c).

**PARTIES**

5. Plaintiff, HENRY MCCONE (McCone) is a natural person and United States citizen and a resident of Orange County, Florida during all relevant times of this action.

6. Defendant, ORANGE COUNTY BOARD OF COUNTY COMMISSIONERS (Orange County), a Political Subdivision of The State Of Florida with its principal place of business at 201 South Rosalind Ave in Orlando, Florida 32801.

## FACTUAL BACKGROUND

7. McCone was hired by Orange County Board of County Commissioners in or about October 2022 in the Mail Processing Center (MPC)/mailroom as a mail clerk in the Orange County Internal Operations Centre (IOC II) located on East South Street in Orlando Florida.

8. In March 2023, McCone was sent to the Orange County Courthouse mailroom for the first time to train in the courthouse mail room procedures.

9. McCone's **Sept 16, 2022 – Sept 15, 2023** evaluation had all meets and at least two exceeds resulting in an avg rating above 2.0. **(Exhibit "A")**

10. From March 2023 to spring 2024, McCone was the only mail clerk (excluding senior clerks and supervisor) instructed to do cleaning duties including but not limited to cleaning the rollup door and top shelf over the judges' mailboxes in the courthouse mailroom.

11. To clean the rollup doors and top shelf, the mail clerk would stand on a rolling stool while holding a wet/dry vacuum in one hand and the hose in the other.

12. During the relevant time from spring 2024 to present, the MPC comprise of five mail clerks (excluding senior clerks and supervisor) for which McCone is the only male clerk and the other four mail clerks are females named Latonya Grace, Darilyn Martinez, Lasabra Moore, & Jessica Retamar.

13. The mail clerks continuously rotate duties from the courthouse to the MPC at IOC II and back to the courthouse throughout the year.

14. McCone and his four female co-worker/mail clerks performed substantially the same duties including but not limited to performing driving route one and two; operating the postage meter machines, doing mail runs; receiving and distributing packages and accountables; doing the 6am courthouse shift and report to the same supervisor Helen Green.

15. One day in spring 2024, it was requested that McCone clean the rollup doors and judges shelf at the end of the week before rotating back to IOC II the next week however, McCone stated he was feeling well (including some dizziness) and would not be able to clean the rollup door and top shelf.

16. When it was time for McCone to rotate back to the courthouse from the IOC II, supervisor Helen Green told McCone over the phone

while McCone was at the IOC II that McCone would be responsible for doing all the courthouse cleaning when McCone return to the courthouse.

17. In an email to Helen Green dated Aug 11, 2024, McCone stated "You called IOC and while on the speakerphone with Tonya and I, you told me multiple times that I would be doing all the cleaning at the Courthouse without giving me a specific reason why but later claim that you don't remember it that way."

18. The Orange County Investigative Report (OPS #: 2024-MI-4518) state on page 25 that "Ms. Blackwell heard Ms. Green say "all the cleaning" to Mr. McCone but she thought Ms. Green was joking, and this was before she created the list."

19. Courthouse cleaning duties was posted on the walls of the courthouse mailroom and the duties state "4. Once a month, whoever is the tallest and can reach the shelf over top of the Judges mailboxes and the garage rollup door; needs to be vacuumed; without hurting themselves." **(Exhibit "B")**

20. The investigative report (OPS #: 2024-MI-4518) state:

> "Ms. Blackwell revealed Ms. Retamar avoids cleaning. Ms. Blackwell remembered Mr. McCone shared with her how Ms. Green told him he would have to do all the cleaning. When she

> returned from vacation, Ms. Green advised her to make a cleaning assignment for each person based on job assignment, i.e. 6:00 a.m. person wipe down rollup door, 7:00 a.m. person clean the mail processing center, door handles, sweeping. She made the list, and Ms. Green approved it."

21. McCone is taller than the other four female clerks Latonya Grace, Darilyn Martinez, Lasabra Moore, & Jessica Retamar.

22. The investigative report (OPS #: 2024-MI-4518) state "She recalled Ms. Blackwell asked Mr. McCone to clean the rolltop door because he was the tallest employee at the courthouse."

23. On April 7, 2024, McCone sent an email to Human Resources (HR) complaining about Ms. Green requiring McCone to do all the cleaning and cleaning the roll-up doors and top shelf while excluding McCone's female co-workers. **(Exhibit "C")**

24. On April 24, 2024, McCone sent an email to HR, Supv. Helen Green, Asst Manager, Kendall Haynes and Manager, Richard Steiger stating:

> "Good morning, FYI, I haven't received a relevant response from HR (it has been over two weeks) concerning my complaint and there haven't been a mark improvement in the cleaning situation. I have moved forward with filing a complaint with the U.S Equal Employment Opportunity Commission." **(Exhibit "D")**

25. After the April 24, 2024 email, Helen Green requested McCone come to her office to discuss the issue concerning McCone's complaint and after that meeting with Helen Green, the courthouse cleaning assignments language was added to state that part 4 concerning the tallest person cleaning the top shelf and rollup door was now voluntary.

26. McCone filed a charge with the Equal Employment Opportunity Commission (EEOC) against Orange County and the EEOC issued McCone a Determination and Notice of Rights letter dated May 5, 2024. (**Exhibit "E"**)

27. In an email to Helen Green dated Aug 11, 2024, McCone stated:

> "Enduring discriminative acts with the implications that Im unethical, immoral or engaged in inappropriate actions including violating vehicle safety laws; being yelled at for the book with intimidated stares and door slamming and being verbally attack and called names like "slimy" has created what is essentially a hostile work environment. And Helen, I blame you for this. Your open attacks on me appear to have giving the green light to others to do the same. What make this even more concerning is that the attacks are mostly coming from Helen Green, Lasabra Moore, & Jessica Retamar which is essentially a clique in the mailroom."

28. Helen Green called McCone at the courthouse from the MPC at IOC II on the speakerphone and yelled at McCone in front of other employees.

29. The investigative report (OPS #: 2024-MI-4518) state:

"Mr. McCone thought Ms. Moore should not be mad at him for knowing about her gun incident as he was there when a deputy came to the mailroom to question how long Ms. Moore had worked for the County…Ms. Martinez recalled a time when Ms. Green raised her voice while on speakerphone on an incident which occurred at the courthouse. She recalled someone (possibly Mr. McCone) allegedly said something (unknown) to Ms. Moore which bothered her. Ms. Green said it was not professional to take what happens and to share it with others. She (Martinez) recalled Mr. McCone was upset and raised his voice as well in response. Ms. Martinez thought Mr. McCone was embarrassed to be addressed in front of everyone like that. Ms. Martinez and Mr. Perez were with Ms. Green at IOC II while she was on a speakerphone with Mr. McCone and Ms. Moore, who were at the Courthouse… Ms. Grace thought Ms. Green was "pissed" as her demeanor was rough, like mind your business, and her voice was raised. She recalled Mr. McCone and Ms. Green were going back and forth until Ms. Green told him to stop, be quiet, and that enough was enough. However, he kept talking and Ms. Green then ended the call and departed for the courthouse…He (Perez) remembered Ms. Green got loud and lectured staff to mind their business as they did not know the whole story. He remembered she was mad at Mr. McCone who asked Ms. Moore what had happened the day after the gun incident. He thought Ms. Green should have addressed Mr. McCone separately."

30. McCone's **Sept 16, 2023 – Sept 15, 2024** evaluation had all meets and at least two need improvements resulting in an avg rating below 2.0. **(Exhibit "4")**

31. On Dec 15, 2024, McCone sent a Whistleblower's complaint to the Orange Couty Mayor, Commissioners and Ombudsman John Petrelli that included allegations of discrimination.

32. In an email to Helen Green dated Aug 11, 2024, McCone stated:

"A little while back, I was working the Courthouse and Jessica was doing route two. Jessica got to the mailroom at 2:32pm. I went to the restroom and returned to the mailroom around 2:38 and as soon as I walked in the mailroom, Jessica was giving me a hard look and pointing to her watch. It was clear that she wanted me to give her the outgoing accountables (e.g. certified book and checks) therefore, she can leave and I didn't. At 2:40, I told her Im going to go to the clerk's mailroom and check the bins one more time and there was nothing in the bins therefore, I gave her the accountable (e.g. certified book and checks) a few minutes early (around 4:43) and she grabbed the book out of my hand while giving me a hard stare and shaking her head side to side. Then she slammed the door by security so hard, the wall shook. In response to this, Janice requested that it be clarified at the next staff meeting that the route two driving has to wait until 2:45 to leave. This didnt help because after it was *put in the staff meeting notes and discussed at the staff* meeting, Jessica yelled at me for the certified book at2:40 and I told her we have already covered this at the staff meeting that the route two driver have to wait until 2:45."

33. In an email to Helen Green dated Feb 20, 2025, McCone stated:

"Good Morning, I would like to address the call I got from Jessica Monday. Jessica called Monday inquiring about the Juvenile interoffice. There are two things that bothered me about the call. First was her tone and attitude on the phone. Jessica had an aggressive and pushy tone and attitude on the phone. She is telling me to bring the Juvenile to IOC. I told her

that the vans are at IOC and Im not coming over in my car. Then she tried some sort of (colloquially speaking) guilt trip or reverse psychology by saying she isn't going to Juvenile now (because she didn't have the juvenile from the courthouse). Second, The called ended and I thought that was it but she called back again about the same thing. This thing she has with continually coming at you when she don't get her way is a problem."

34. Documentation Of Non-Disciplinary Counseling /Disciplinary Actions, Date of incident: 2-17-2025 state:

"Henry failed to follow operational procedures by not collecting mail and impacting MPC route mail without properly notifying chain of command. The procedure Henry failed to adhere to is found in the SOP, mail Processing, l. Courthouse MPC Procedures, 2. Mondays - Fridays (shift 6am to 3p). Henry took it upon himself to not perform his duties as assigned. When questioned by a co-worker about missing route mail Henry informed said co-worker, he left the mail for another co-worker to bring the mail to IOC 2 as he wasn't driving his personal car to deliver the mail. This decision was not discussed with any senior clerk or supervisor prior to executing the decision."

35. The SOP, mail Processing, l. Courthouse MPC Procedures, 2. Mondays - Fridays (shift 6am to 3p) on Feb 17, 2025 stated

2. Mondays – Fridays (*SHIFT 6:00 am to 3:00 pm*)

   a. **6:00 am** – shift begins at IOC MPC (pick up Mail vehicle)

   b. Pick up mail from USPS, take to Courthouse MPC

   c. Sort and distribute Court Administration, State Attorney, Public Defender mail, and route #2 mail

   d. Sort and deliver the Clerk of Court mail to their mailroom

   e. Return mail vehicle and deliver USPS mail to IOC 2

   f. Return to Courthouse for work day

36. Feb 17, 2025 was President's Day and the Post Office was closed therefore McCone couldn't "Pick up mail from USPS".

37. The SOP, mail Processing, I. Courthouse MPC Procedures, 2. Mondays - Fridays (shift 6am to 3p) on Feb 17, 2025 don't make any reference to interoffice mail (e.g. Juvenile Court interoffice mail)

38. At the July 31, 2025 PDH hearing, Helen Green stated: "The first step of the SOP at the 6am is to report to IOC, You did not do that. Right there, you are in violation."

39. McCone reported to IOC II on Feb 17, 2025 and clocked into work on the computer located in the MPC mailroom at IOC II.

40. McCone's employee badge was used to enter the IOC II mailroom door on Feb 17, 2025 at 5:59:35 am. **(Exhibit "G")**

41. Documentation Of Non-Disciplinary Counseling /Disciplinary Actions with incident date July 17, 2023 state "On Tuesday July 25th the Supervisor received a missing mail email from the clerk of court leading to an investigation. Subsequent to this investigation this incident was brought to light. This incident was never reported to the supervisor nor the senior clerks as told in SOP F/1.f."

42. McCone informed Helen Green that he reported the July 17, 2023 mail incident to senior clerk Gabriel Perez before the Documentation Of Non-Disciplinary Counseling /Disciplinary Actions with incident date July 17, 2023 was issued.

43. The investigative report (OPS #: 2024-MI-4518) state:

"Mr. McCone admitted to being upset about the discipline he received which was written to say he did not notify Ms. Green or the senior clerk (Perez) regarding the lost mail incident. He stressed he sat in her office and told her (Green) how he had notified Mr. Perez via phone and had spoken to Ms. Moore and Ms. Retamar about the lost mail and asked them for guidance on how it should be handled. Although Ms. Green was on vacation, he still called her office number as she forwarded it to her county cellular device, but she did not answer. Ms. Retamar was notified at the post office that the mail was found so he texted Mr. Perez to notify him. Mr. McCone stressed Mr. Perez and Ms. Moore also told Ms. Green that he (McCone) had notified Mr. Perez. Mr. McCone stated the discipline still reflects how he did not report it to her or the senior mail clerk… Ms. Retamar was aware of the lost mail as Mr. McCone had

specifically informed her previously and requested her to ask the postal employee if anyone had located and turned in the mail... Ms. Moore recalled how Mr. McCone left mail on the roof of the van and it blew off. She recalled an employee from the State Attorney's Office located it. She remembered Mr. McCone came in and told her about how he lost the mail, and how he had tried to locate it. She advised him to notify Mr. Perez. She thought Mr. McCone advised Mr. Perez about the incident… Through her investigation, she confirmed Mr. Perez was notified by Mr. McCone of the lost mail."

44. Orange County Policy 413 state "7. Conduct in a work or non-work status which discredits the County government, public officials, fellow employee(s), or themselves (e.g. viewing and or distributing pornographic material, stealing, **dishonesty**)" (emphasis added) first offense is Suspension to Termination and second offense is Termination.

45. McCone made a public record request (PRR-174755) for all disciplinary actions against Helen Green since starting her employment with Orange County and there were no disciplinary actions provided to McCone for Helen Greens false statements in disciplinary actions against McCone that "This incident was never reported to the supervisor nor the senior clerks as told in SOP F/1.f." and "Henry failed to follow operational procedures by not collecting mail and impacting MPC route mail without properly notifying chain of command. The procedure Henry failed to

adhere to is found in the SOP, mail Processing, l. Courthouse MPC Procedures, 2. Mondays - Fridays (shift 6am to 3p)."

46. In Grievance #13291 "**APPEAL/GRIEVANCES OF DOCUMENTATION OF NONDISCIPLINARY COUNSELING/DISCIPLINARY ACTIONS**" McCone stated:

> "There was a huge mail blunder by Jessica that potentially cost the County 100s of dollars. I saw Jessica run a long tray (which holds over 500 #10 envelopes) of #10 envelopes at a rate over $1. It appeared to be ran at flat rate. At the time presort was under 60 cent. Helen Green was present and stated she was going attempt to get a refund from the post office. This was a major failure to comply with the SOP and cost a major disruption of the MPC, lost of supplies and potential loss of 100s of dollar. It appears no disciplinary Actions was taken."

47. Documentation Of Non-Disciplinary Counseling /Disciplinary Actions (Written Reprimand) with incident date Feb 20, 2025 state "Henry emailed his supervisor with a tone that was received as rude and disrespectful by making personal attacks and harshly criticizing how the supervisor should handle team conflicts within the MPC team."

48. There were no **personal** attacks on the face of the Feb 20, 2025 email.

49. McCone repeatedly requested that management identify which statements in the Feb 20, 2025 email management deemed disrespectful

and to date management hasn't disclosed which statements is the email that they deemed disrespectful.

50. In an email to Helen Green dated Sept 2, 2024, McCone stated:

"There is another issue that concerns me. I have repeatedly came in to do the 6am shift and Lasabra is in the IOC office at 6am alleging that she is making up time but when I return to IOC to drop off the mail and head back to the courthouse she isnt at IOC. One time I was got in my car around 6:45am to head back to the courthouse and she pulled up in her Jeep and jumps out with a Chick-fil-A bag Chick-fil-A opens at 6am and we both was at IOC at 6am. The last time we was at IOC together at 6am, she was gone again when I got back and when I was leaving IOC after dropping off the 6am mail, I saw her Jeep coming through the back side of IOC parking lot and when I got to the light, she was backing in the parking lot in front of the side door we use. One of the issues is that last Christmas I requested time off around Christmas (I believe it was for Dec 29, 2023) but didn't get the day off and was left swinging in the wind and Lasabra got that whole week of Christmas to New years off. Although Lasabra was ahead of me on the holiday list, the question is where did she get the time from given how often she takes off. The point is that I shouldn't have to compete for time off with time allegedly made up or saved that wasn't actually worked (e.g. time made up in the chick-fil-a drive thru). The issue is of concern because the holidays are coming up again."

51. The investigative report (OPS #: 2024-MI-4518) state:

"Ms. Martinez has utilized the time made-up benefit when she has an appointment and may come in early at 6:00 a.m. to work, but she does not stay late... Mr. Perez explained he checks myOCTime (for coverage reasons) to make sure personnel are at the courthouse. He has seen Ms. Moore make

> up a full day once, by working anywhere from 9 to 11 hours daily. Mr. Perez thought the procedures only allowed for two hours to be made up in a week, but he was unaware if there had been any changes. Mr. Perez attested Ms. Green has been flexible with everyone (come in early, shorten lunch, stay late) to include himself. Mr. Perez clarified he did not believe Mr. McCone had utilized the time made up as he is very dependable…Ms. Green explained there is no time made-up limit in FM policy; rather, it is left up to the individual supervisor's discretion. Ms. Green attested she allows staff to come in early at 6:00 a.m., shorten lunch by half hour, or stay late until 5:00 p.m. Ms. Green explained there is no limit to how many hours they can make up while staying within the scheduled parameters. Ms. Green affirmed everyone has used time made up, barring possibly Mr. McCone and Ms. Martinez."

52. The MPC Aug 15, 2025 Staff Agenda Meeting handout stated "Making Up time- this is extended to the entire staff (with prior notification to supervisor)" (**Exhibit "H"**)

53. The ability to makeup hours of time in a single week by coming in early (e.g. at 6am) and staying late (e.g. 4:30 pm – 5pm) wasn't extended to McCone until the Aug 15, 2025 Staff Agenda Meeting.

54. McCone filed a EEOC charge of discrimination on July 29, 2025.

55. McCone gave notice to Helen Green, Kendall Haynes, HR and Richard Steiger at the July 31, 2025 PDH hearing that McCone filed a new charge of discrimination.

56. McCone sent a copy of the new July 27, 2025 EEOC charge of discrimination to the Orange County Mayor's Office and tracking indicate that it was received on Aug 19, 2025. (**Exhibit "I"**)

57. McCone's **Sept 16, 2024 – Sept 15, 2025** evaluation resulting in an avg rating of 1.14. (**Exhibit "J"**)

58. Due to the 1.14 score on McCone's evaluation, McCone was denied a 5 percent salary increase for Fiscal Year 2025 to 2026.

59. McCone received an email from Helen Green dated Sept 19, 2025 that stated McCone was "not eligible for a salary increase for Fiscal Year 25/26, based on their annual review score per 201 Salary Administration" (**Exhibit "K"**)

60. McCone ask Helen Green for specific example of McCone's performance failures in the **Sept 16, 2024 – Sept 15, 2025** evaluation and she wouldn't provide any and stated the statements in the evaluation are "generalizations".

61. McCone's **Sept 16, 2024 – Sept 15, 2025** evaluation state "Due to multiple disciplinary actions, Henry demonstrates a need for improvement in several key areas of professional development…Throughout this past

year, Henry has faced several disciplinary challenges that have highlighted critical areas for growth and development."

62. The investigative report (OPS #: 2024-MI-4518) state:

> "OPS questioned Ms. Green on why Ms. Moore's evaluation does not include any mention the gun incident. Ms. Green admitted this is due to her lack of knowledge at the time of the gun incident and having to be guided by department management on how to handle the situation. When asked by OPS, she did not know whether Ms. Moore's discipline should have been reflected in the evaluation as she thought it was a separate private incident which had already been addressed by the department via the disciplinary process."

63. The investigative report (OPS #: 2024-MI-4518) state "Ms. Moore admitted she left her personal firearm in her bag on September 27, 2023, and accidentally brought it into the Courthouse. She immediately notified Ms. Green" and "Ms. Green disclosed Ms. Moore was immediately accountable for her actions by calling her to report the gun incident."

64. Lasabra Moore was detained for entering the Orange Couty Courthouse for work purposes with a handgun on Sept 27, 2023 (**Exhibit "L"**).

65. The gun incident resulted in Lasabra Moore being suspended for one day/eight hours by Orange County.

66. The evaluation period was Sept 16, 2023 – Sept 15, 2024.

67. Since McCone's first day of employment in the Orange County MPC, no other MPC employee except McCone has had disciplinary actions mention in their evaluation.

68. Lasabra Moore place sticky notes on Helen Green's door in the MPC mailroom that state she "choose violence always". (**Exhibit "M"**)

69. Section 7, page 38 of the Risk Management Safety and Health Manual state "a threat is often the clearest sign that violence may follow… You never know when a threat will be followed by violence. Treat all threats seriously. Don't ignore a threat".

70. Lasabra Moore received "NON-DISCIPLINARY COUNSELING" (no Verbal/Oral Warning (documented) or Written Reprimand) for placing the sticky notes on Helen Green's door in the MPC mailroom that state she "choose violence always".

71. McCone has repeatedly raised safety concern about Lasabra Moore's action and behavior including concerns about possible workplace violence.

72. After raising safety concern about Lasabra Moore's action and behavior, Orange County continue to place and schedule Lasabra Moore in close proximity to McCone.

73. On Feb 17, 2026, McCone sent an email to Helen Green, Kendall Haynes, Richard Steiger and HR rep Jequella Williams stating:

> "I am writing to formally reiterate that my safety concerns regarding working with Ms. Lasabra Moore remain unchanged...Beyond the postings themselves, there is a documented history of concerning conduct. Ms. Moore was found to have brought a firearm to the Orange County courthouse, resulting in suspension and a criminal court appearance. She later verbally confronted me in front of three coworkers without provocation. Ms. Green was also required to intervene in an altercation between Ms. Moore and Senior Clerk Gabriel Perez at the IOC office. According to the investigative report, Mr. Perez recalled Ms. Moore stating daily over the course of approximately one week in October 2024 that she "chooses violence" during work hours. Repeated statements of that nature, particularly in a professional workplace and in light of the other documented incidents, are not reasonably perceived as playful or humorous. They are intimidating and sufficient to cause alarm in reasonable persons. Taken together, the prior firearm incident, repeated statements about "choosing violence," postings on a supervisor's door to similar effect, and subsequent workplace altercations present a pattern of conduct that I believe poses a legitimate safety concern. My fear is not speculative; it is based on documented events and admissions reflected in the investigative materials. I respectfully request that upper management reassess this matter with workplace safety as the paramount concern. I do not feel safe working in close proximity with Ms. Moore, and I am formally placing the County on notice of my continuing safety concerns." **(Exhibit "N"**)

74. On June 1, 2026, McCone sent an email to Natasha Swift, Professional Standards Investigator and stated:

> "Good afternoon Natasha Swift, I am writing to formally report concerns regarding my upcoming work schedule and the ongoing hostile work environment issues that I have previously raised. I am currently scheduled to work with Helen Green, Lasabra Moore, and Jessica Retamar from June 8–12, 2026."

75. McCone was placed on a Performance Improvement Plan (PIP).

**(Exhibit "O" amended pip with dates)**

76. McCone responded with a rebuttal to the PIP with a section titled "Discriminatory and Retaliatory Context Undermining the Evaluation and Any PIP". **(Exhibit "P")**

77. At one of the PIP follow up meeting, Helen Green told McCone that "everything" (e.g. concerns, question) must come to her first.

78. McCone received and email from Helen Green with subject line "Clear plan of action" that stated

> "If an unexpected situation arises that is not covered by an SOP, policy, or procedure, your first action must be to check with me before taking any steps… Any questions, concerns, or changes related to daily operations must be brought to me as your supervisor so I can determine the correct course of action." **(Exhibit "Q")**

79. The clear plan of action was issued while McCone was on the PIP.

80. McCone responded to the clear plan of action and stated:

"I also note that I previously asked, "Good afternoon. Does this 'Clear plan of action' apply only to me or the entire MPC staff?" Thisquestion remains unanswered, despite your statement that you are committed to providing clarity. Several statements in the "Clear plan of action" are concerning, including: "If an unexpected situation arises that is not covered by an SOP, policy, or procedure, your first action must be to check with me before taking any steps," and, "Any questions, concerns, or changes related to daily operations must be brought tome as your supervisor so I can determine the correct course of action." In practice, this denies me access to the knowledge and assistance routinely provided by Senior Clerks Gabriel Perez, Janice Blackwell and even co-workers while my female comparator continues to receive their assistance. Requiring me to bypass the senior clerks and making my "first action" to come to you, while others are not held to the same restriction, constitutes discriminatory, retaliatory, and harassing treatment."

"Finally, I am requesting a clear answer to this question: Does the "Clear Plan of Action" apply only to me, or to the entire MPC staff ? More specifically, does it apply to Jessica, Lasabra, Darilyn, and Latonya? If it applies only to me, please state the specific basis for that decision."

"This email responds to the "Clear Plan of Action" and addresses ongoing concerns of discrimination, retaliation, and harassment. My consistent position has been that the allegations in my performance evaluations and related disciplinary actions lack specificity and are supported by explanations that are vague, inconsistent, contradictory, and conclusory. This directly conflicts with Orange County's own communication standards, which instruct employees to avoid ambiguous language and to ensure that all necessary details are included. These deficiencies are not harmless; they are evidence of pretext and retaliatory animus." **(Exhibit "Q")**

81. Human Resources representative Jequella Williams stated in the clear plan of action email chain that "In reviewing your communication, I see you mentioned discriminatory, retaliatory, and harassing treatment. In line with OC Policy 402 Harassment and Discrimination, the Office of Professional Standards (OPS) will be notified of your complaint accordingly." **(Exhibit "Q")**

82. McCone amended the EEOC charge to include the PIP and clear plan of action.

83. McCone was trained at the IOC II MPC by senior clerk Gabreil Perez.

84. McCone was trained at the Orange County courthouse mailroom by senior clerk Janice Blackwell.

85. Senior Clerks perform important functions like correcting OC Time, approving time off, and giving instruction on what to do when unexpected situations come up like road and office closures.

86. McCone received a notice of possible disciplinary action for including human resources on the clear plan of action email chain.

87. At the final PIP follow up meeting, Helen Green informed McCone that he failed the PIP because McCone emailed HR in the clear plan of action email chain.

88. The failed PIP state in the supervisor's notes that

> "On February 3, 2026, you replied to an email sent by your supervisor and copied HR—again outside the chain of command—despite several warnings and disciplinary actions instructing you not to involve HR in departmental management concerns. These behaviors hinder team effectiveness and impede the organization's ability to operate efficiently. At this time, there remains a continued failure to demonstrate comprehension of these requirements or to show meaningful improvement in either your professional communication or your overall performance, even after completing the assigned communication training."

89. McCone received a Pre-Determination Hearing (PDH) notice that stated "This action is proposed due to the incident that took place on February 3, 2026, where you sent you an email to Human Resources regarding your Performance Improvement Plan."

90. The investigative report (OPS #: 2026-MI-4678)(**Exhibit "R"**) state:

> "Ms. Williams acknowledged to OPS that employees are allowed to contact HR directly... Ms. Williams stated she later became aware that a PDH notice referenced Mr. McCone's communication with HR. She stated that, as far as HR communication, management cannot tell an employee they

cannot communicate with HR, and a single statement copying HR was not enough to justify a PDH."

"Ms. DaJuana Glover-Thomas stated she became involved in matters involving Mr. McCone after responsibilities transitioned from a prior HR Business Partner, Ms. Robinson. Ms. Glover-Thomas reviewed PIP-related materials and described the PIP as "vague." She stated the PIP needed more substance and clearer expectations… Ms. Glover-Thomas stated she discussed her concerns with Ms. Williams, Ms. Maria Ventura (Misconduct Investigation Administrator, OPS) and Mr. Steiger. She reported that Mr. Steiger agreed the failed PIP determination needed to be rescinded. Regarding the PDH, Ms. Glover-Thomas understood it involved job performance and an email/copying HR issue. She stated she advised Mr. Steiger (unknown date) that management could not pursue a PDH against an employee for copying HR on emails. According to Ms. Glover-Thomas, Mr. Steiger acted quickly, and the PDH did not proceed."

"After reviewing the "Clear Plan of Action" email during his OPS interview, Mr. Steiger did not recall the email specifically and did not see the email as egregious. Rather, he understood it as a direction to seek guidance when there were questions about SOPs or expectations, particularly where there had been prior concerns about Mr. McCone not seeking guidance or acting independently."

91. McCone stated in the clear plan of action email chain that

"I have included Mr. Steiger because I am formally requesting that the PIP be withdrawn. It is submitted in bad faith and is retaliatory and harassing, particularly because it is grounded in the February 17, 2025 disciplinary action, which is itself based on false statements. If the PIP is not withdrawn and is allowed to proceed, I request that all future PIP meetings be recorded… Regarding the PDH, Mr. Steiger stated Ms. Green sent a

request; he drafted the PDH notification letter, and HR reviewed and approved the letter before scheduling the hearing."

92. At a previous hearing Mr. Steiger expressed his displeasure in McCone contacting HR.

93. The PIP went from failed to completed and the PDH was cancelled.

94. The investigative report (OPS #: 2026-MI-4678) state "Mr. Steiger stated the PIP went through several revisions and he recalled HR guidance to change the status to completed while not changing certain narrative language."

95. The completed PIP kept the following language:

"You successfully completed Task 1 - 3 of this PIP assignment displaying a better understanding of the 6X3 route even when the post office is closed. Demonstrating the ability to locate policies, procedures, SOP, when needed for reference and operate the mail machine successfully. There continues to be a significant lack of progress toward meeting the expectations outlined in your Performance Improvement Plan (PIP), particularly in the areas of professional communication and overall performance. The communication training you were assigned, along with the PIP, was intended to support the development of constructive dialogue, strengthen working relationships, and promote ongoing professional growth. Despite the resources and support provided, there has been no observable improvement in your listening skills, your ability to engage in productive discussions, or your capacity to give and

receive feedback in a professional manner. In addition to communication concerns, there are ongoing performance issues that remain unaddressed. These include difficulty following established procedures and a pattern of not adhering to direction provided by leadership. This has been demonstrated through your continued lack of adherence to protocols established by Orange County, repeated management coaching, and several emails instructing you not to escalate departmental concerns outside the chain of command. On February 3, 2026, you replied to an email sent by your supervisor and copied HR—again outside the chain of command—despite several warnings and disciplinary actions instructing you not to involve HR in departmental management concerns. These behaviors hinder team effectiveness and impede the organization's ability to operate efficiently.

At this time, there remains a continued failure to demonstrate comprehension of these requirements or to show meaningful improvement in either your professional communication or your overall performance, even after completing the assigned communication training.

96. McCone's Sept 16, 2025 – Sept 15, 2026 evaluation has all meets and no need improvements.

97. There are no reports of Latonya Grace, Darilyn Martinez, Lasabra Moore, & Jessica Retamar yelling, attacking, raising their voice at each other or the need for intervention by management however, the only two males in the MPC mailroom has be victims of numerous aggressive altercations with female mail clerks in the for example the OPS investigation revel that Lasabra Moore and senior clerk Mr. Gabrial Perez

got in an altercations so bad that the supervisor Helen Green had to come to the MPC to intervene.

97. McCone was issues a determination and notice of right by the EEOC on Aug 19, 2026. **(Exhibit "S")**

98. The Plaintiff has satisfied all statutory prerequisites for filing this action.

## COUNT I
## SEX DISCRIMINATION – DISPARATE TREATMENT
## Title VII – 42 U.S.C. § 2000e-2(a)

99. McCone realleges and incorporates by reference paragraphs 1 through 98 of this Complaint as though fully set forth herein.

100. At all relevant times, McCone was an employee of Orange County and was qualified for his position as a Mail Clerk.

101. McCone is male and therefore belongs to a protected class under Title VII of the Civil Rights Act of 1964.

102. McCone performed substantially the same job duties as his female coworkers, including mail processing, operating postage equipment, delivering mail, handling accountables, and performing courthouse and IOC assignments.

103. McCone was the only male mail clerk among the five mail clerks performing these substantially similar duties.

104. Orange County, through its supervisors and management, subjected McCone to disparate treatment because of his sex, including assigning him cleaning responsibilities that were not similarly imposed upon his female coworkers, requiring him to perform physically demanding duties, and treating him less favorably with respect to workplace flexibility and performance evaluations.

105. McCone was specifically instructed to perform all courthouse cleaning duties, including cleaning the rollup doors and the shelf above the judges' mailboxes, while similarly situated female employees were not subjected to the same requirements.

106. McCone was also singled out for physically demanding assignments and responsibilities while female employees received more favorable treatment concerning the distribution of work assignments.

107. Orange County afforded female employees workplace flexibility, including opportunities to make up work hours, while McCone was effectively excluded from that flexibility until August 15, 2025.

108. Orange County treated McCone less favorably in evaluating and documenting employee performance. McCone received a negative performance evaluation, including an overall rating of 1.14, while female employees who had engaged in documented workplace misconduct or received disciplinary action received more favorable evaluations.

109. Orange County further denied McCone the five-percent salary increase for Fiscal Year 2025-2026 based upon the unfavorable performance evaluation.

110. McCone's prior performance evaluation for September 16, 2022 through September 15, 2023 reflected an overall rating of 2.05, with all competencies rated Meets or Exceeds. The subsequent decline in McCone's evaluation and resulting loss of compensation occurred against the background of the discriminatory treatment alleged herein.

111. The circumstances surrounding Orange County's treatment of McCone, including the different standards applied to similarly situated female employees, support a reasonable inference that McCone's sex was a motivating factor in Orange County's employment decisions.

112. Orange County's conduct adversely affected McCone's compensation, terms, conditions, and privileges of employment.

113. Orange County's conduct violated Title VII, 42 U.S.C. § 2000e-2(a).

114. As a direct and proximate result of Orange County's unlawful conduct, McCone suffered damages, including lost compensation, lost employment benefits and opportunities, emotional distress, humiliation, and other economic and noneconomic damages.

115. McCone is entitled to all relief available under Title VII, including back pay, appropriate equitable relief, compensatory damages, allowable interest, costs, and reasonable attorney's fees.

**COUNT II**
**RETALIATION**
**Title VII – 42 U.S.C. § 2000e-3(a)**

116. McCone realleges and incorporates by reference paragraphs 1 through 98 of this Complaint as though fully set forth herein.

117. McCone engaged in activities protected by Title VII, including:

a. Complaining to Human Resources on April 7, 2024, concerning sex discrimination and disparate treatment;

b. Informing Orange County's management on April 24, 2024, that McCone intended to pursue an EEOC complaint;

c. Filing an EEOC charge of discrimination in 2024;

d. Submitting complaints to Orange County's management and elected officials concerning discrimination, harassment, and retaliation;

e. Filing a subsequent EEOC charge of discrimination on July 29, 2025, and notifying Orange County's management of that charge;

f. Opposing discriminatory and retaliatory practices through subsequent written complaints to management, Human Resources, and the Office of Professional Standards.

118. Orange County had actual knowledge of McCone's protected activities, including through direct communications with his supervisor, Human Resources, management, and the July 31, 2025 predetermination hearing.

119. After McCone engaged in protected activity, Orange County subjected McCone to materially adverse employment actions and retaliatory conduct.

120. Such conduct included, but was not limited to:

a. Issuing disciplinary actions and written reprimands based upon disputed and allegedly inaccurate allegations;

b. Subjecting McCone to an unfavorable performance evaluation for September 16, 2024 through September 15, 2025;

c. Denying McCone the five-percent salary increase for Fiscal Year 2025–2026 based upon the unfavorable performance evaluation;

d. Subjecting McCone to a Performance Improvement Plan;

e. Issuing a Clear Plan of Action imposing additional supervisory requirements and restrictions on how McCone was expected to address operational matters;

f. Initially determining that McCone failed the PIP despite documentation reflecting completion of the assigned tasks;

g. Initiating a proposed predetermination hearing that referenced McCone's communication with Human Resources concerning his PIP and discrimination complaints; and

h. Continuing to subject McCone to heightened scrutiny and unfavorable treatment after he complained about discrimination and retaliation.

121. The timing and circumstances of these actions, the repeated reliance upon disputed disciplinary allegations, and Orange County's treatment of McCone following his complaints support a reasonable inference of a causal connection between McCone's protected activity and Orange County's retaliatory conduct.

122. Orange County's Office of Professional Standards investigation acknowledged that McCone engaged in protected activity when he complained of discrimination in 2024 and when he emailed Human Resources on February 3, 2026, alleging discrimination.

123. The proposed predetermination hearing paperwork specifically referenced McCone's February 3, 2026 communication with Human Resources. Orange County's own investigation subsequently identified problematic language in that paperwork concerning an employee's right to contact Human Resources.

124. Although Defendant subsequently changed the PIP determination from failed to completed and canceled the proposed predetermination hearing, those subsequent corrections do not eliminate the significance of the conduct or the circumstances under which the actions were initiated.

125. Orange County's retaliatory conduct, considered individually and collectively, would dissuade a reasonable employee from making or supporting a charge of discrimination.

126. Orange County's actions were undertaken because McCone opposed practices made unlawful by Title VII and/or participated in protected proceedings under Title VII.

127. Orange County thereby violated 42 U.S.C. § 2000e-3(a).

128. As a direct and proximate result of Orange County's retaliation, McCone suffered damages, including lost compensation, emotional distress, humiliation, and other economic and noneconomic damages.

129. McCone is entitled to all relief available under Title VII, including back pay, compensatory damages, appropriate equitable relief, allowable interest, costs, and reasonable attorney's fees.

**COUNT III**
**HOSTILE WORK ENVIRONMENT BASED ON SEX**
**Title VII – 42 U.S.C.**

130. McCone realleges and incorporates by reference paragraphs 1 through 98 of this Complaint as though fully set forth herein.

131. McCone is male and belongs to a protected class under Title VII.

132. McCone was subjected to unwelcome harassment and hostility by his supervisor and coworkers, including conduct involving disparate work assignments, repeated verbal confrontations, yelling, intimidating behavior, door slamming, and derogatory name-calling.

133. McCone was singled out for cleaning responsibilities and physically demanding duties that were not similarly imposed upon his female coworkers.

134. McCone's female coworkers were afforded more favorable treatment concerning work assignments, workplace flexibility, and the application of performance and disciplinary standards.

135. McCone's supervisor, Helen Green, publicly raised her voice at McCone over the telephone while McCone was on speakerphone with other employees, creating an embarrassing and intimidating situation.

135. McCone was also subjected to hostile and intimidating conduct by coworkers, including aggressive verbal confrontations, yelling, door slamming, and being called names such as "slimy."

136. McCone repeatedly complained to Orange County about the unequal treatment and hostile conduct, including complaints to Human Resources, his supervisor, management, and other County officials.

137. Orange County had actual knowledge of the complained-of conduct but failed to take effective corrective action to prevent the discriminatory treatment and harassment from continuing.

138. The harassment and unequal treatment were connected to McCone's sex, including the disparate assignment of physically demanding duties and the different treatment afforded to female employees performing substantially similar work.

139. The conduct was objectively and subjectively offensive and, considered in its totality, was sufficiently severe or pervasive to alter the terms and conditions of McCone's employment and create an abusive working environment.

140. Orange County is responsible for the hostile work environment because the conduct involved its supervisory personnel and coworkers, and Orange County knew or should have known of the conduct but failed to take appropriate corrective action.

141. Orange County's conduct violated Title VII, 42 U.S.C. § 2000e-2(a).

142. As a direct and proximate result of Orange County's unlawful conduct, McCone suffered emotional distress, humiliation, interference with his ability to perform his job, and other compensable damages.

143. McCone is entitled to all relief available under Title VII, including compensatory damages, appropriate equitable relief, allowable interest, costs, and reasonable attorney's fees.

**COUNT IV**
**RETALIATORY HOSTILE WORK ENVIRONMENT**
**Title VII – 42 U.S.C.**

144. McCone realleges and incorporates by reference paragraphs 1 through 98 of this Complaint as though fully set forth herein.

145. McCone engaged in protected activity under Title VII by opposing sex discrimination, reporting harassment and discriminatory treatment, filing EEOC charges, and participating in protected administrative proceedings.

146. Orange County had actual knowledge of McCone's protected activities through communications with his supervisor, Human Resources, management, and the Office of Professional Standards.

147. Following McCone's protected activities, Orange County and its supervisory personnel subjected McCone to a continuing course of retaliatory conduct that included both employment-related and workplace-related actions.

148. The retaliatory conduct included repeated verbal confrontations, yelling, intimidating behavior, derogatory name-calling, and other hostile treatment by McCone's supervisor and coworkers.

149. Orange County further subjected McCone to increased scrutiny, disciplinary actions, an unfavorable performance evaluation, denial of a five-percent salary increase, a Performance Improvement Plan, a Clear Plan of Action, an initial failed-PIP determination, and proposed disciplinary proceedings.

150. The retaliatory conduct continued after McCone filed his July 29, 2025 EEOC charge and notified Orange County's management of his protected activity.

151. The retaliatory conduct further escalated following McCone's February 3, 2026 written communication to management and Human Resources in which McCone again raised allegations of discrimination, harassment, and retaliation.

152. Orange County's own investigative report acknowledged that McCone engaged in protected activity when he complained of discrimination in 2024 and when he communicated discrimination allegations to Human Resources on February 3, 2026.

153. The proposed disciplinary hearing paperwork specifically referenced McCone's communication with Human Resources. Orange County's investigation subsequently identified concerns with the language used in that paperwork and confirmed that employees are permitted to communicate directly with Human Resources concerning discrimination and harassment matters.

154. Orange County's subsequent correction of the failed-PIP determination and cancellation of the proposed disciplinary hearing did

not erase the preceding course of conduct or the impact of the retaliatory treatment upon McCone.

155. The individual incidents, considered collectively, constitute a continuing course of retaliatory conduct that would dissuade a reasonable employee from making or supporting a charge of discrimination.

156. Orange County's conduct was motivated, at least in part, by McCone's opposition to discriminatory employment practices and his participation in protected proceedings under Title VII.

157. Orange County's conduct violated Title VII, 42 U.S.C. § 2000e-3(a).

158. As a direct and proximate result of Orange County's retaliatory conduct, McCone suffered emotional distress, humiliation, interference with his work environment, lost compensation, and other economic and noneconomic damages.

McCone is entitled to all relief available under Title VII, including back pay, compensatory damages, appropriate equitable relief, allowable interest, costs, and reasonable attorney's fees.

## JURY TRIAL DEMAND

McCone requests a jury trial on all questions of fact raised by its Complaint.

**Date: November 16, 2026**

Henry L. McCone
P.O. Box 555022
Orlando, FL 32855
321-287-7824